HOLLOWAY, Circuit Judge,
dissenting.
I cannot join my colleagues in affirming Nathan Archuleta’s convictions on the two counts relating to an alleged July 2009 conspiracy to possess and distribute methamphetamine.[1] My firm belief that the district court erred in admitting significant portions of Officer Paul Lujan’s “gang expert” testimony compels me to dissent. Much of the challenged testimony was irrelevant and inflammatory. It misled the jury. It prejudiced Mr. Archuleta’s defense. And it had no place at trial — at least not in a fair one. Today’s majority now compounds the district court’s errors by accepting the violations of the Federal Rules of Evidence.

Mr. Archuleta and Federal Rule of Evidence 403

Mr. Archuleta, a member of a gang known as the Sureños, stood accused of conspiring to possess and distribute a size-able amount of methamphetamine. The fact of Mr. Archuleta’s longstanding affiliation with the Sureños was never at issue in this case. Likewise, there was no dispute whatsoever that he knew and associated with the other principals in the alleged drug-smuggling conspiracy — Adam Ramirez, Candi Ramirez, and Christine Roberts — each of whom testified against Mr. Archuleta at trial. The governments case should properly have been left to rise or fall on the testimony of these self-confessed coconspirators and the admissions of Mr. Archuleta, leaving the jury to weigh the credibility of the government’s cooperating witnesses against that of Mr. Ar- *1300 chuleta and the version of events presented in his own defense.
In appropriate circumstances, evidence of gang affiliation and gang activity may, of course, be admitted to prove a conspiracy or to “ ‘show the basis of the relationship between the defendant and witnesses.’ ” United States v. Brown, 200 F.3d 700, 708 (10th Cir.1999) (quoting United States v. Sloan, 65 F.3d 149, 151 (10th Cir.1995)); see also United States v. Robinson, 978 F.2d 1554, 1562 (10th Cir.1992) (stating that “associational evidence may be directly relevant on the issues of formation, agreement and purpose of a conspiracy”). But those proper aims were not really achieved here, for Officer Lujan’s testimony had very little to do with either Mr. Archuleta or his relationship with the Ramirez siblings and Ms. Roberts — again, a relationship that did not need to be explored or explained through expert testimony because the involved parties had already testified about it themselves at length.
Rather, Officer Lujan’s testimony had much to do with creating an aura of fear and mistrust around Mr. Archuleta — not Mr. Archuleta the individual defendant, but Mr. Archuleta the Sureño. Officer Lujan, in effect, told the jury over and over that the Sureños were evil men who did evil things. The great risk of such testimony is that, in the eyes of the jurors, Mr. Archuleta would cease to be seen as one person, charged with discrete criminal acts, but entitled to a presumption of innocence and a fair trial. Instead, he would be viewed only as a dangerous member of a dangerous group, one who is certainly capable (and quite possibly guilty) of committing any of the criminal activities and antisocial behaviors ascribed to the organization — not least of all the particular crime charged.
The inclusion of Officer Lujan’s gratuitous testimony about the Sureños offended both the letter and spirit of Federal Rule of Evidence 403, which allows a court to “exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.” As for the challenged testimony, the majority concedes that “[i]n most cases, concern about such innuendo would be proper.” Maj. Op. at 1295. Nevertheless, the majority goes on to conclude that Officer Lujan’s testimony was not unfairly prejudicial and that “even if the district court abused its discretion in admitting Lujan’s testimony, ... the error was harmless.” Id. at 1296.
I do not agree. In my view, this was error that requires reversal, particularly when the clearly established burden of the government to show that the errors were harmless is taken into account. “The burden of proving the error is harmless is on ‘the beneficiary of the error.’ ” United States v. Montgomery, 439 F.3d 1260, 1263 (10th Cir.2006) (quoting Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)); see also United States v. Glover, 413 F.3d 1206, 1210 (10th Cir.2005) (“In non-constitutional harmless error cases, the government bears the burden of demonstrating, by a preponderance of the evidence, that the substantial rights of the defendant were not affected.”) (citing Williams v. United States, 503 U.S. 193, 203, 112 S.Ct. 1112, 117 L.Ed.2d 341 (1992)). Here, the majority has effectively relieved the government of any such burden.

Officer Lujan’s Testimony

Officer Lujan had much to say to the jury. The transcript of his testimony *1301 spans fifty-one pages in the record. Through him, the jury was treated to an introductory course . on the foundational history of the Sureños while simultaneously being schooled in the arcana of the gang’s symbols, tattoos, and initiation rituals. And Officer Lujan did not limit himself merely to providing a lurid snapshot of the history and habits of the Sureños. He also peppered his testimony with repetitive references to home invasions, drive-by shootings, kidnappings, burglaries, and beatings allegedly committed by them. The government does not convincingly explain why any of this information was actually relevant to proving Mr. Archuleta’s participation in a single plan to smuggle drugs on a single day in 2009 — nor can it, because the information was not in any way useful in helping the jury understand the other testimony in the case or in determining the facts at issue.[2]
Officer Lujan’s testimony is worth a close look. Mr. Archuleta’s trial took place in Las Cruces, Doña Ana County, New Mexico. The pool of jurors was drawn from that vicinity. Officer Lujan informed the jurors that the Doña Ana County area had seen “a spike in gang violence” and that “[t]he crime that we were having ... was primarily gang-related.” R. Vol. 3, pt. 10, at 1453. When Officer Lujan spoke of gangs and gang violence, he was specifically referring to the Sureños. He stated that “[wje’ve had numerous drive-by shootings.” Id. And he spelled out other particulars “of all the crime that we’re having” for the jury, as well: “The home invasions, the narcotics, the burglaries, the auto burglaries.... ” Id. A little later on, Officer Lujan again reminded the jury of “the drive-by shootings and home invasion and so forth.” Id. *1302 at 1454. And, after describing the extensive reach of the Sureños in southern New Mexico and beyond, he returned to the theme of Sureños “doing home invasions, doing drug rips, auto burglaries, anything criminal.” Id. at 1456. And yet again: “drive-bys, shootings.” Id. at 1459.
Officer Lujan also spoke at length about the Sureños’ connections to the Mexican Mafia and their extensive networks both within and outside of the prison system. See id. at 1451-52. He described the Sureños’ violent initiation ceremonies. See id. at 1457. He discussed their draconian methods of imposing internal order and discipline among their membership, noting that a disobedient Sureño is “going to get dealt with, either assaulted pretty bad, beat, stabbed, shot, kidnapped.” Id. at 1460. As for a Sureño who chooses to leave the gang, “They’re going to get beat. They’re going to get dealt with. They’re going to get physically assaulted every single time because they left their gang.” Id. at 1458. In a similar vein, he told of their ruthlessness in dealing with informants, who the jury was told are subjected to “severe beatings, assaults,” id. at 1460, and who will “get shot, dealt with, kidnapped, taken across the border,” id. at 1461.
Not a word of this line of testimony was probative of anything at issue in Mr. Ar-chuleta’s trial, and none of it should have been allowed to come in. The majority makes much of the fact that Mr. Archuleta himself frankly admitted that he was, in essence, a criminal with a long history of bad acts, bad decisions, and bad associations. Indeed, the majority appears to hold Mr. Archuleta’s candor against him. See Maj. Op. at 1295 (opining that “to the extent there is a concern that the jury might have heard Lujan’s testimony and linked Archuleta to those crimes, we think that Archuleta pretty well took care of that himself’ and that “we are dubious that the jury’s regard for Archuleta was susceptible of decrease”); id. at 1296 (observing that Mr. Archuleta “meticulously assassinated his own character”). The majority misses the point.
Contrary to the majority’s suggestion, my reason for dissenting in this case has nothing to do with safeguarding Mr. Ar-chuleta’s “moral standing,” see id. at 1295, in the eyes of the jurors or, for that matter, anyone else. My concern is with fairness: the fundamental guarantee to which Mr. Archuleta, as a criminal defendant, is entitled. Mr. Archuleta may mistreat women, hurt dogs, and threaten police officers. He may habitually abuse alcohol and illegal drugs. He may be aggressive, callous, sometimes violent, and in no way a productive member of society. But Mr. Archuleta was not on trial for those things, and, just as surely, none of them is relevant to proving the existence of a conspiracy in this case.[3]
*1303 The difference between Mr. Archuleta’s own testimony about his past unsavory behavior and Officer Lujan’s testimony is that the latter was admitted because it was supposedly relevant to proving a conspiracy between Mr. Archuleta and his alleged accomplices. It represented the authoritative word of a law-enforcement officer, one who lived in the same community as the jurors and who was presented to them as a well-qualified expert in gang matters. Officer Lujan’s testimony was calibrated to obtain a conviction, and that is precisely the problem. He did not know Mr. Ar-chuleta, but he told the jury that he knew what a Sureño was like. And they were all pretty much the same, and they were all pretty evil. That, in a nutshell, was Officer Lujan’s expert testimony. Its purpose seems largely to have been to instill fear and loathing in the jury. The risk that the testimony achieved that aim is far too great to countenance an affirmance of Mr. Archuleta’s conviction in this case.[4]

Conclusion

In Mr. Archuleta’s case, the government repeatedly chose to augment its evidence with additional layers of improper inference and innuendo. This was nothing but piling on. Our system of criminal justice deals with guilt, not guilt by association. When the government and its lawyers start going too far down that road, any reliable determination of actual guilt becomes unattainable for the individual criminal defendant. There is strong reason to believe the government went too far here.
Mr. Archuleta deserved a fair trial. He got something less than that. I respectfully dissent.

. Mr. Archuleta was charged by a grand jury with six felony counts, two of which related to the alleged July 2009 conspiracy. Count 1 charged that, on July 2 and 3, 2009, Mr. Archuleta conspired to possess, with the intent to distribute, 50 grams and more of methamphetamine, in violation of 21 U.S.C. § 846. Count 2 charged Mr. Archuleta with possession of 50 grams and more of methamphetamine with intent to distribute on July 2, 2009, in violation of 21 U.S.C. § 841. Mr, Archuleta was acquitted of two additional charges, contained in Counts 4 and 6 of the indictment. Finally, he was found guilty on Counts 5 and 7, which involved firearms and drug-possession charges relating to his November 2009 arrest following a high-speed chase. I would reverse Mr. Archuleta’s convictions on Counts 1 and' 2 — the charges stemming from the alleged July 2009 conspiracy.

. The majority appears to urge that this lengthy recitation by Officer Lujan was necessary to show that Mr. Archuleta was a "threatening authority figure” within "a rigid hierarchy,” Maj. Op. at 1294, whose implacable control over his alleged coconspirators was cemented by violence or the imminent threat of violence, either at the hands of Mr. Archuleta individually or the Sureños at large. According to Officer Lujan and the majority, Mr. Archuleta’s power over his confederates was wholly derived from his high-ranking status within the Sureños, and thus it was important to lay out the entirety of the gang’s violent saga for the jury in order to explain the source of his ability to dragoon others into doing his criminal bidding.
This strikes me as wrong for two reasons. To begin with, Officer Lujan’s testimony, in both its detail and scope, went far beyond merely providing relevant associational evidence tending to show a relationship among the alleged coconspirators. As noted above, gang-affiliation testimony may be relevant in explicating the "formation, agreement and purpose of a conspiracy.” Robinson, 978 F.2d at 1562. It may also "show the basis of the relationship between the defendant and witnesses." Sloan, 65 F.3d at 151. Had Officer Lujan limited his testimony to those well-defined purposes, the testimony likely would have been properly admissible. But Officer Lujan did not give a straightforward description of Mr. Archuleta's interactions with Ms. Roberts and the Ramirez siblings, as viewed in the context of his Sureño affiliation. His testimony more closely resembled a baroque narrative of Sureño violence and depredation. As such, it exceeded the limits of relevance.
Second, it is not insignificant that two of the three testifying coconspirators, Ms. Roberts and Ms. Ramirez, were not members of the Sureños at all. Ms. Roberts was a sometime lover of Mr. Archuleta's, and Ms. Ramirez was Mr. Ramirez’s sister. For this reason, it would seem that extensive testimony about life as a member of the Sureños, with its attendant obligation of unquestioning loyalty to one’s Sureño leaders, would be of limited utility at best in describing their relationship to Mr. Archuleta. It is one thing for Ms. Roberts or Ms. Ramirez to testify that they were well-acquainted with Mr. Archule-ta, and that they were frightened or intimidated by him. It is quite another matter to attempt to ground their apprehension, as did the government, in tales of the Mexican Mafia, gangland initiations, or crime waves in Las Cruces.

. The majority also overemphasizes the fact that Mr. Archuleta was acquitted by the jury on two of the conspiracy counts against him. Those counts related to an allegedly further-reaching drug conspiracy spanning from July 2009 to November 5 of that year, when Mr. Archuleta was arrested. It appears that the parties involved with, and the facts and evidence underlying, this alleged conspiracy substantially differed from those surrounding the alleged conspiracy of July 2 and 3, 2009. The majority never describes the evidence supporting the purported July-November 2009 conspiracy, or the lack of such evidence, as is perhaps the more likely situation. To be sure, a case might be so flimsy that even a barrage of unfairly prejudicial testimony cannot distract a jury from the essential weakness of the charges.
The charges relating to the alleged conspiracy of July 2 and 3, 2009 are entirely another matter. The testimony of Ms. Roberts and the Ramirez siblings dealt directly — and extensively — with Mr. Archuleta's participation in that alleged July 2009 conspiracy, for which he was ultimately convicted on Counts 1 and *1303 2. By introducing Officer Lujan’s prejudicial testimony, the government placed a heavy thumb on the scales that balanced the testimony of those cooperating witnesses with Mr. Archuleta's conflicting account of the events that took place on July 2 and 3, 2009. And that is the insurmountable problem with Officer Lujan’s testimony and, by extension, Mr. Archuleta’s conviction on those counts. For the reasons explained in this dissent, Officer Lujan’s testimony could not help but "affect adversely the jury’s attitude toward the defendant wholly apart from its judgment as to his guilt or innocence of the crime charged.” United States v. Irving, 665 F.3d 1184, 1213—14 (10th Cir.2011) (alterations omitted) (internal quotation marks omitted). Because there is a serious possibility that the jury was im-permissibly swayed in its deliberations surrounding the July 2 and 3, 2009 conspiracy counts, I believe reversal is required.

. I focus my dissent on the district court's abuse of discretion in admitting unfairly prejudicial testimony against Mr. Archuleta in violation of Rule 403. I agree with the majority that Mr. Archuleta failed to raise objections under Federal Rules of Evidence 702 and 704(b) at trial, thereby limiting us to plain-error review of those issues. Because I believe there are adequate grounds for reversal based on the violations of Rule 403 alone, I do not address the viability of Mr. Archule-ta’s arguments for reversal on Rule 702 and 704(b) grounds.